1

THE HONORABLE JOHN C. COUGHENOUR

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

JAMES HAMMER, *et al.*,

9

Plaintiff,

10

v.

11

FRONTIER FINANCIAL
CORPORATION, PATRICK M. FAHEY,
JOHN J. DICKSON, MICHAEL J.
CLEMENTZ, CAROL E. WHEELER,
and ROB ROBINSON,

12

13

14

Defendant.

CASE NO. C10-0643

ORDER

15      This matter comes before the Court on Defendants' motion to dismiss the complaint (Dkt.

16  No. 55), Plaintiff's response (Dkt. No. 58), and Defendants' reply. (Dkt. No. 62.) The Court also

17  considers Defendants' request to take judicial notice. (Dkt. No. 57.) Having thoroughly

18  considered the parties' briefing and the relevant record, the Court finds oral argument

19  unnecessary and rules as follows.

20  **I.      BACKGROUND**

21          **A.  Factual Background**

22          This case concerns the collapse of Frontier Bank ("Frontier"), an institution that at one

23  point had dozens of branches across Washington and Oregon. On a motion to dismiss, the

24

1    allegations in the complaint are taken to be true. *Al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir.

2    2009). In mid-June 2008, Frontier was informed that the Washington State Department of

3    Financial Institutions ("DFI") and the Federal Deposit Insurance Corporation ("FDIC") were

4    planning an on-site evaluation to review the Bank's operations. (Compl. ¶ 32.) Frontier was

5    given advance notice of documents to make available, and the evaluation occurred from July 22,

6    2008 through August 8, 2008. (*Id.*) The regulators interviewed Frontier's CEO (Defendant

7    Dickson), President (Defendant Clementz), CFO (Defendant Wheeler), as well as the Controller,

8    Chief Credit Officer, loan officers, credit officers, and internal auditors. (*Id.*)

9         In August 2008, regulators met with Frontier's Board of Directors and senior

10   management and presented the findings of the examination. (¶ 34.) The content of this meeting

11   and the behavior of Frontier's management afterwards convinced some people within Frontier

12   that the regulators would soon issue the bank a Cease and Desist Order ("C&D"). Specifically,

13   some people within Frontier knew that it was operating with inadequate capital, that allowance

14   for loan and lease losses ("ALLL") reserves were insufficient, that loans were of poor quality,

15   that lending and collection practices were unsatisfactory, that liquidity provisions were

16   inadequate, and that management performance was unsatisfactory. (¶¶ 34, 36 & 37.)

17        A Report of Examination ("ROE") was delivered to Frontier by the FDI and FDIC on

18   December 29, 2008. The ROE stated that Frontier was "operating with a large volume of poor

19   quality loans" and "with an inadequate loan reserve." (¶ 38.) On March 24, 2009, Frontier issued

20   a press release disclosing that they had been issued a Cease and Desist Order. (¶ 40.) The Cease

21   and Desist Order repeated the findings made in the ROE and issued several directives to Frontier,

22   including: retaining a qualified management team, having the Board implement a policy for

23   determining adequacy of the allowance for loan and lease losses, increasing and maintaining

24

1    capital levels, and reducing various risks. (*Id.*) The next day, March 25, Frontier stock dropped

2    12.59 percent. On March 31, 2009, Frontier's independent auditor expressed an adverse opinion

3    on Frontier's financial reporting. (*Id.*) On April 30, 2010, the DFI closed the Bank and the FDIC

4    was appointed as the receiver. Trading of Frontier stock was halted on May 12, 2010 and two

5    weeks later, Nasdaq announced that it would be delisted. In December 2010, the FDIC's Office

6    of Inspector General issued a material loss review ("OIG Report") outlining the factors that had

7    led to Frontier's failure.

8         Plaintiff alleges that during the period between July 22, 2008, the day the regulatory

9    examination began and March 25, 2009, when Frontier stock dropped 12.59% after

10   announcement of the C&D ("the class period"), Defendants made false and misleading

11   statements, discussed below, to investors that failed to fully disclose the extent of their financial

12   problems. In addition, Plaintiff alleges that Defendants failed to adequately and timely record

13   ALLL, causing Frontier's financial results and capital ratios to be misstated. Plaintiff brings suit

14   against Defendants for violation of §10(b) of the 1934 Securities Act and SEC Rule 10b-5.

15   Plaintiff brings suit against Defendants Dickson, Fahey, Clementz, and Wheeler for violation of

16   §20(a) of the 1934 Act. Defendants move to dismiss.

17        **B.  Allegations of Misleading Statements**

18        Plaintiff alleges that Defendants employed deceptive accounting practices throughout the

19   class period and made false statements about the financial health of the bank during three

20   periods: the second quarter of 2008, the third quarter of 2008, and the announcement of the 2008

21   year-end results.

22        1.  The Second Quarter of 2008

23        On July 22, 2008, the beginning of the Class Period, Frontier issued a press release

24

1    discussing their financial results for the second quarter of 2008. The release stated that the

2    provision for loan losses had been increased from $1.9 million in the second quarter of 2007 to

3    $24.5 million in the second quarter of 2008. The press release also announced that net income for

4    the second quarter of 2008 was $0.04 per share, compared to $0.40 per share for the second

5    quarter of 2007. Plaintiff alleges that this statement was misleading because the regulatory

6    examination conducted by the FDIC and DFI had determined and announced to Frontier that the

7    bank had inadequate reserves for loan losses, and that with more accurate loan loss reserves, the

8    net income per share would have been reduced. (Dkt. No. 40 at ¶¶ 44–47.)

9         Plaintiff alleges that Frontier made a series of similar statements during this period.

10   During a July 22, 2008 conference call, led by Defendants Dickson, Wheeler, and Robinson, as

11   well as President and Chief Banking Officer Lyle Ryan, Dickson discussed the strength of

12   Frontier's capital ratios and Robinson stated that the loan loss reserves were able to provide

13   adequate support for losses that might arise. (¶¶ 48–49.) On August 1, 2008, Frontier filed a

14   Form 10-Q stating the bank's financial results for the second quarter of 2008. The Form stated

15   that the policy of the bank was to maintain capital above the point where, for regulatory

16   purposes, it would be classified as "well-capitalized." (*Id.* at ¶¶ 51, 53 & 54.) On September 18,

17   2008, Frontier filed a Form 8-K with the SEC which stated that they would continue to exceed

18   capital levels necessary to remain "well-capitalized" at quarter-end. (*Id.* at ¶¶ 51, 53 & 55.)

19        Plaintiff alleges that all of these statements hid the true state of the bank's finances.

20   According to Plaintiff, the ROE detailed a series of problems and weaknesses about which

21   Defendants knew or should have known: operating with inadequate capital relative to the kind

22   and quality of assets Frontier held, operating with an inadequate loan valuation reserve,

23   operating with poor quality loans, and operating with inadequate provisions for liquidity. (*Id.* at

24

1    ¶¶ 50, 52 & 56.)

2            1.   The Third Quarter of 2008

3            On October 23, 2008, Frontier issued a press release discussing its financial results for

4    the third quarter of 2008. The press release reported a loss of $0.38 per share, stated that Frontier

5    was continuing to build loan loss reserves, and announced that the bank remained well

6    capitalized and maintained strong liquidity. (*Id.* at ¶ 57.) Also on October 23, 2008, Defendant

7    Dickson stated in Frontier's analyst conference call for the third quarter of 2008 that Frontier

8    was "in the well-capitalized status for regulatory purposes." (*Id.* at ¶ 62.)

9            Plaintiff alleges that these statements are misleading for two reasons. First, they failed to

10   disclose the problems identified in the ROE. Second, these statements were made without

11   disclosing that the FDIC and the DFI had concluded their investigation of Frontier, had found

12   material deficiencies in capital and loan loss reserves, and had determined to issue a cease and

13   desist order against Frontier. (*Id.* at ¶¶ 61 & 63.)

14           2.   2008 Year-End Results

15           On January 29, 2009, Frontier issued a press release announcing its financial results for

16   the fourth quarter of 2008 and the fiscal year ending December 31, 2008. The release stated that

17   in the fourth quarter of 2008, Frontier had a net loss of $1.90 per share. For the 2008 fiscal year,

18   Frontier had a net loss of $1.91 per share. In an analyst conference call on the same day,

19   Defendant Dickson stated that the bank's 28% liquidity ratio was strong. In the same call,

20   Defendant Fahey stated that the capital range was reasonable, that regulators "appreciated if not

21   applauded the steps that the company has taken thus far" and that he had not heard anything

22   negative from the regulators. On March 12, 2009, Frontier filed its Annual Report on Form 10-K

23   for fiscal year 2008. The report stated that the bank was taking appropriate precautions, that

24

1  management believed capital resources and liquidity were sufficient, and that disclosure controls

2  and procedures were adequate. (*Id.* at ¶¶ 69, 70, 72 & 73.)

3      As with the previous statements, Plaintiff alleges that these statements are misleading in

4  light of the problems identified in the ROE. Failure to disclose these problems was particularly

5  misleading, Plaintiff claims, because Frontier received a copy of the final ROE on December 29,

6  2008—just a few weeks prior. (*Id.* at ¶ 71.)

7      3.  Failure to comply with GAAP and SEC rules

8      Finally, Plaintiff alleges that Frontier overstated their assets and net income by failing to

9  properly account for its loan loss reserves. Specifically, Plaintiff alleges that Defendants failed to

10  reserve for Frontier's risky and impaired Commercial Real Estate ("CRE") and Acquisition,

11  Development, and Construction ("ADC") loans. If Frontier had increased reserves for credit and

12  loan losses in the manner that, Plaintiff alleges, Generally Accepted Accounting Procedures

13  ("GAAP") and SEC rules required, Frontier would have been required to drastically reduce its

14  net income and earnings per share. (¶ 76.)

15  **II.   APPLICABLE LAW**

16      Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain

17  statement of the claim showing that the pleader is entitled to relief." The pleading standard Rule

18  8 announces does not require "detailed factual allegations," but it demands more than an

19  unadorned, the-defendant-unlawfully-harmed-me accusation. *Ashcroft v. Iqbal*, --- U.S. ---, 129

20  S. Ct. 1937, 1949 (2009). A pleading that offers "labels and conclusions" or "a formulaic

21  recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S.

22  544, 555 (2007). Nor does a complaint suffice if it tenders "naked assertion[s]," devoid of

23  "further factual enhancement." *Id.* at 557. "To survive a motion to dismiss, a complaint must

24

1   contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

2   face.'" *Iqbal*, 129 S. Ct. at 1949. In reviewing Defendants' motion, then, the court accepts all

3   factual allegations in the complaint as true and draws all reasonable inferences from those facts

4   in favor of Plaintiff. *Al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009). Although Rule

5   12(b)(6) does not require courts to assess the probability that a plaintiff will eventually prevail,

6   the allegations made in the complaint must cross "the line between possibility and plausibility of

7   'entitlement to relief.'" *Iqbal*, 129 S. Ct. at 1949.

8         Under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R.

9   240.10b-5(b), a plaintiff must plead six elements: (1) a material misrepresentation or omission;

10  (2) scienter; (3) a connection between the misrepresentation or omission and purchase or sale of

11  a security; (4) reliance; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC*

12  *v. Scientific-Atlanta, Inc*., 552 U.S. 148, 156 (2008).

13        In an effort to deter abusive and frivolous securities-fraud claims, Congress enacted the

14  Private Securities Litigation Reform Act of 1995 ("PSLRA"), which raised the pleading

15  standards for private securities fraud claims. *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 973

16  (9th Cir. 1999). Pursuant to the PSLRA, the complaint must "specify each statement alleged to

17  have been misleading, the reason or reasons why the statement is misleading, and if an allegation

18  regarding the statement or omission is made on information and belief, the complaint shall state

19  with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition,

20  the PSLRA requires that the complaint "state with particularity facts giving rise to a

21  strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2). In

22  this Circuit the required state of mind is one of "deliberate or conscious recklessness." *Silicon*

23  *Graphics*, 183 F.3d at 979. n8. However, if the challenged act is a forward-looking statement, the

24

1  required state of mind is "actual knowledge . . . that the statement was false or misleading." 15

2  U.S.C. § 78u-5(c)(1). If a plaintiff fails to plead either the alleged misleading statements or

3  scienter with particularity, his or her complaint must be dismissed. *Id.* § 78u-4(b)(3)(A); *No. 84*

4  *Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920,

5  931–932 (9th Cir. 2003).

6      The heightened pleading standard under the PSLRA applies only to the element of

7  scienter; all other elements of a § 10(b) claim are governed by traditional pleading standards

8  under Fed. R. Civ. P. 8(a) or 9(b).

9  **III.   DISCUSSION**

10     **A.    Falsity**

11     Defendants argue that Plaintiff has failed to allege that any of Defendants' statements

12  were false. Because a significant portion of Plaintiff's falsity allegations, detailed above, are

13  based on the ROE, Defendants seek to challenge the use of this document. Defendants' first

14  argument is that the complaint's reliance on the ROE is nothing but revisionist history.

15  According to Defendants, Plaintiff has taken language about undercapitalization from the Cease

16  and Desist Order issued in March 2009 and retroactively attributed it to the ROE, issued in July

17  2008, with no basis to believe that the language actually appeared in the July 2008 ROE. In

18  support of this allegation, Defendants show that the language in the complaint that Plaintiff

19  claims to have taken from the ROE is identical to language in the Cease and Desist Order.

20  (*Compare* Dkt. No. 40 ¶¶5, 34, 38, 50, 52, 59, 61, 65, 68, 71, with Dkt. No. 55 Ex. 26.) This

21  argument is unpersuasive. Plaintiff clearly states in his complaint that the Cease and Desist Order

22  repeated the findings in the ROE. (¶ 40.) In a motion to dismiss, the Court assumes that all

23  allegations in the complaint are true, and Defendants have not shown that a repetition of

24

1    language from an earlier report is implausible.

2         Defendants' next quibble with the ROE is equally unavailing. Defendants argue that

3    ROEs are highly confidential and that banks are prohibited from making any representation

4    concerning such communication. *See* 12 C.F.R. § 309. Material in a confidential report,

5    Defendants argue, is no basis to establish the truth of public statements. But while Defendants

6    may have been prohibited from disclosing a report that uncovered weak capitalization, they are

7    not free to knowingly make misleading public statements that contradict findings in that report.

8    The complaint does not fault Defendants for failing to disclose the report—it faults them for

9    failing to disclose the practices identified in the report. Defendants do not allege that they are

10    prohibited from disclosing inadequate capitalization, liquidity, or weak loans.

11         Defendants also criticize Plaintiff's reliance on the OIG Report. They argue that while the

12    Complaint relates to events in 2008 and 2009, the OIG conducted its review in late 2010. (Dkt.

13    No. 62 at 2.) Therefore, Defendants argue, the OIG Report is "retrospective" and does not

14    provide an accurate assessment of what Defendants knew. This is an utterly unconvincing

15    mischaracterization of the Report. The OIG Report contains numerous accounts of deficiencies

16    that were found by the FDIC and reported to Frontier between 2005 and 2010:

17          Frontier was cited for credit administration deficiencies at each examination from 2005 to 2009. In addition, the bank was cited for loan underwriting weaknesses in

18          2005, 2007, and 2008 and various violations of laws and regulations and contraventions of policy statements from 2006 to 2010. In particular, the bank

19          was cited for appraisal violations at three examinations and one visitation and for contravention of policy statements regarding the ALLL at one examination and

20          one visitation.

21    (Dkt. No. 60-1 at 4.) Digging themselves even deeper, Defendants assert that the report "clearly

22    states" that Frontier's problems resulted from economic and real estate market declines. (Dkt.

23    No. 62 at 2.) This is a gallingly inaccurate claim. The first two sentences of the first paragraph of

24    the section titled "Causes of Failure and Material Loss" read: "Frontier's failure was attributed

1    primarily to weak Board and management oversight of the institution's high CRE and ADC loan

2    concentrations. Specifically, the Board and management did not establish risk management

3    practices commensurate with the risks associated with this lending, some of which involved

4    speculative construction lending." (Dkt. No. 60-1 at 3.) The Court requests that Defendants

5    employ greater precision when summarizing documents in the future.

6          Defendants' final argument is that Frontier made several public disclosures outlining its

7    concerns about the housing market and announcing that it was taking measures to preserve

8    capital. (Dkt. No. 62 at 4–8.) But Defendants offer no support for the proposition that truthful

9    statements about their dire financial condition have the power to negate misleading ones. They

10   do not. See, e.g., *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y.

11   2006). (plaintiffs sufficiently pled that defendants' multiple disclosures did not counterbalance

12   defendants' misleading statements).

13         The Court is satisfied that Plaintiff has articulated a plausible basis for the falsity of

14   Defendants' statements.

15   **B.      Scienter**

16         Defendants argue that Plaintiff has failed to articulate a plausible basis for his allegations

17   that Defendants made false or misleading statements with scienter. When deciding the issue of

18   scienter, a court's role is to consider allegations holistically. "The inquiry, as several Courts of

19   Appeals have recognized, is whether all of the facts alleged, taken collectively, give rise to a

20   strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets

21   that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-323 (2007). In

22   conducting this inquiry, the Court weighs individual parts, but makes a final inference from the

23   whole. "A complaint will survive . . . only if a reasonable person would deem the inference of

24

1   scienter cogent and at least as compelling as any opposing inference one could draw from the

2   facts alleged." *Id*. at 324. In this instance, the Defendants' knowledge and state of mind is

3   inferred from three sources: regulator reports and meetings, alleged accounting-rule violations,

4   and statements from confidential witnesses. The first two sources provide support for an

5   inference of scienter. The third might support that inference if certain amendments were made.

6   Until Plaintiff files an amended complaint, the Court withholds its judgment as to whether or not

7   the inference of scienter is at least as compelling as opposing inferences.

8       1.   Regulator Reports and Documents

9       First, Defendants argue that the regulator reports cannot be used to determine

10  Defendants' knowledge during the class period. As stated above, the Court is unconvinced by

11  Defendants' characterization of these documents. Plaintiff has alleged that there are numerous

12  inconsistencies and contradictions between Defendants' public statements and Defendants'

13  contemporaneous knowledge. Plaintiff's reliance on regulator reports for these allegations is

14  proper. "The most direct way to show both that a statement was false when made and that the

15  party making the statement knew that it was false is via contemporaneous reports or data,

16  available to the party, which contradict the statement." *Nursing Home Pension Fund, Local 144*

17  *v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir. 2004).

18      2.   GAAP and SEC Rule Violations

19      Defendants' second argument is that Plaintiff fails to allege that Defendants did not

20  adhere to GAAP and SEC rules and that even if these rules were not strictly adhered to, they are

21  subjective rules and failure to abide by one interpretation of those rules is not indicative of

22  scienter.

23

24

1    As discussed above, Plaintiff alleges that a failure to increase credit and loan loss

2    reserves led to an artificially inflated financial condition. (¶ 76.) Defendants argue that Plaintiff

3    fails to specify "which of the listed Statement of Financial Accounting Standards ("SFAS") or

4    interagency guidelines Frontier allegedly violated and does not plead any specific facts from

5    which one could discern when, where and how they were violated." (Dkt. No. 55 at 23.)

6    Defendants go on to argue that Plaintiff has failed to specify the amount by which revenues and

7    earnings were overstated and the specific bad loans for which ALLL and capital levels proved

8    inadequate. Plaintiff responds that this level of detail is not required. The Court agrees.

9    The Ninth Circuit applied the *Tellabs* standard to the context of alleged GAAP violations

10   in *In re Daou Sys.* When making allegations of irregular revenue recognition, the court stated, a

11   plaintiff should provide detail in four areas: amount of overstatement, products involved, dates of

12   transactions, and identities of employees involved in the transactions. *In re Daou Sys.*, 411 F.3d

13   1006, 1016 (9th Cir. 2005). However, Plaintiff need not allege each of those particular details.

14   They only need allege enough information so that a court can discern whether the alleged GAAP

15   violations were minor or technical in nature, or whether they constituted widespread and

16   significant inflation of revenue. *Id.* at 1017.

17   Plaintiff has made sufficient allegations that, taken as true, indicate widespread and

18   significant accounting problems. The OIG Report indicates that Frontier management had

19   repeatedly been informed of a list of problems with their ALLL methodology: in June 2007,

20   examiners "recommended enhancements" to the ALLL methodology; the ROE concluded that

21   ALLL was underfunded by $23 million, and that procedures for implementing Financial

22   Accounting Standards ("FAS") needed improvement; the August 2009 and 2010 reports stated

23   that ALLL methodology needed strengthening and that implementation of FAS No. 5 and No.

24

1    114 was flawed specifically due to reliance on outdated appraisals. (Dkt. No. 60-1 at 9.) The OIG

2    Report concludes that when ALLL was "appropriately funded," the Bank's earnings decreased

3    significantly. (*Id.*) Plaintiff has satisfactorily alleged which rules were not followed and in what

4    manner.

5         Defendants respond that regardless of accounting defects, the strongest inference to

6    emerge is that Defendants were exercising their best judgment and failed to anticipate the

7    magnitude of the loss. Such an inference is entirely possible. But language in the OIG Report

8    gives the Court pause:

9         Frontier failed to adequately improve the bank's credit risk management
          practices, and many of the weaknesses examiners identified in Frontier's credit
10        risk management practices in the [July] 2008 examination can be associated with
          one or more of the key risk management processes discussed in the [March 17]
11        FIL-22-2008.

12   (Dkt. No. 60-1 at 8.) The inference suggested by this passage is that Defendants were aware of

13   the problems and did not correct them. Plaintiff's allegations of GAAP violations are sufficient

14   to form a part of the complaint's scienter allegations.

15        3.   Witnesses

16        Third, Defendants argue that Plaintiff has failed to identify a series of confidential

17   witnesses ("CW1", "CW2", etc.) with sufficient particularity. A complaint relying on statements

18   from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements.

19   First, the confidential witnesses whose statements are introduced to establish scienter must be

20   described with sufficient particularity to establish their reliability and personal knowledge. *Zucco*

21   *Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citing *In re Daou Sys.*, 411

22   F.3d 1006, 1015–1016 (9th Cir. 2005)). Second, those statements which are reported by

23   confidential witnesses with sufficient reliability and personal knowledge must themselves be

24

1     indicative of scienter. *Id.* In satisfying the first prong, *Zucco* holds that where, as here, there is no

2     documentary evidence to corroborate witness statements, plaintiffs may only rely on confidential

3     witnesses when the complaint provides an adequate basis for determining that the witnesses have

4     personal knowledge of the events they report. *Id.* The Court's determination involves an

5     evaluation of the "level of detail provided by the confidential sources, the corroborative nature of

6     the other facts alleged (including from other sources), the coherence and plausibility of the

7     allegations, the number of sources, the reliability of the sources, and similar indicia." Daou, 411

8     F.3d at 1015.

9        Although the Court is satisfied with some elements of the confidential witness

10    statements, other elements fail to establish sufficient particularity. If Plaintiff wishes to establish

11    scienter, some amendment of the complaint is required.

12       CW2, "a DFI official with personal knowledge of the Frontier examination", provides

13    information about the examination conducted by the DFI and FDIC. Defendants argue that such

14    disclosure would be unusual, given that it could violate state and federal laws. This is insufficient

15    reason to doubt the basis of CW2's disclosures. Even if the disclosures were prohibited, a

16    question the Court does not answer, the fact that a disclosure is prohibited is no indication that it

17    did not occur. Other details about the examination that appear to come from CW2, such as the

18    number of examiners and the defendants interviewed, are not attributed directly, but leave the

19    reader with the impression that they came from CW2. Plaintiff must amend the complaint to

20    make the source of these details clear.

21       CW5 is an internal auditor who reported to the Bank's Audit Committee before leaving in

22    2009. CW5 attended a meeting in the summer of 2008 with the FDIC, DFI, and the Bank's

23    Board and management. Plaintiff alleges that CW5 learned about certain CAMELS rankings the

24

bank had received based on the bank's Capital, Asset Quality, Management, Earnings, Liquidity and Sensitivity to risk. Plaintiff further alleges that the presentation made it apparent to CW5 that a cease and desist order was forthcoming. Plaintiff concludes the paragraph by alleging that after the meeting, Defendants clearly knew that the Bank was operating with inadequate capital and inadequate liquidity provisions. (¶ 34.) The Court is not satisfied with Plaintiff's formulation of this allegation. Here, above, and elsewhere, Plaintiff provides a specific quote from a confidential witness, and then adds unsupported assertions in a way that suggests they come from the witness. Plaintiff must amend the complaint to provide greater detail about the meeting attended by CW5 and how it is so "clear" that Defendants knew about the bank's failings.

Allegations based on the testimony of CW6, a Senior Internal Auditor at the Bank, suffer from the same flaw. Plaintiff states that CW6 noticed certain loan loss reserves that were based on annual appraisals conducted before 2008. (Dkt. No. 40 at ¶ 30.) The paragraph concludes, without attribution, that these appraisals were outdated, gave inflated valuations, and led to unreliable loan loss reserve numbers. These averments are insufficient to satisfy the heightened pleading requirement for fraud under Rule 9(b). "A plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citing *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994)). Here, Plaintiff has provided the "neutral fact" that the appraisals were conducted before 2008, but has not explained whether the conclusion that this practice came from CW6 or elsewhere. Plaintiff must amend the complaint.

CW8's statement that exit agendas were shared by examiners with the management does not contain any facts to support a personal basis for that knowledge. (¶ 33.)

1    CW9's statement that (1) he was told by Defendants Dickson and Clementz that (2)

2    Defendant Fahey was told by the FDIC that (3) the Bank should replace its senior management is

3    vague and convoluted hearsay. (¶ 35.) Statements from confidential witnesses that are based on

4    vague hearsay "while not automatically precluded from consideration to support allegations of

5    scienter, may indicate that a confidential witnesses' report is not sufficiently reliable, plausible,

6    or coherent to warrant further consideration[.]" *Zucco*, 552 F.3d 981 at 997 n.4. CW9's

7    testimony must be amended for these allegations to stand.

8    Plaintiff alleges that CW10 was told that "things don't look too good now for the bank"

9    because examiners were investigating an issue previously unknown to them. (¶ 33 n. 8.) As

10   Defendants correctly point out, this allegation lacks any of the requisite particularity concerning

11   what the examiners were investigating or why it didn't look good for the bank. Without these

12   details, the allegations are no more than water-cooler gossip.

13   Plaintiff must also amend the allegations surrounding CW11's statements to show an

14   adequate basis for CW11's knowledge of what happened during ALCO meetings. (¶ 31.)

15   Finally, the allegations based on the statements of CW12 suffer the same problem as

16   those based on the statements of CW6: CW12 makes an observation that Defendant Fahey

17   wanted to obtain $100 to $200 million on broker deposits. (¶ 36.) The complaint then concludes,

18   with no attribution or support, that the FDIC disfavors such deposits. Plaintiff must set forth facts

19   to show why obtaining such deposits is suspect. *See Vess*, 317 F.3d at 1106.

20   These defects are not fatal to the complaint. But they show a pattern of attributing a few

21   minor facts directly to a confidential witness and then following these facts with broad, damning,

22   unsupported assertions in the same paragraph. The Court will not accept this style of pleading.

23   **C.    Plaintiff's Claims are Actionable**

24

1           1.   Forward-looking statements

2           Defendants argue that the safe harbor provisions of the PSLRA protect their forward-

3    looking statements and preclude liability. A forward looking statement is any statement

4    regarding "(1) financial projections, (2) plans and objectives of management for future

5    operations, (3) future economic performance, or (4) the assumptions 'underlying or related to'

6    any of these issues." *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.*

7    *West Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003). A forecast is actionably false if "'there is

8    no reasonable basis for the belief'" or "'the speaker is aware of undisclosed facts tending

9    seriously to undermine the statements' accuracy.'" *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th

10   Cir. 1996) (citation omitted). Even where the safe harbor is triggered, it does not protect

11   statements made with actual knowledge of falsity, as alleged here. Although Defendants did state

12   that allowance for loan losses *might* not be adequate to cover actual losses, Plaintiff alleges that

13   Defendants failed to disclose what they learned as a result of the ROE: loan loss reserves *were*

14   inadequate. (Dkt. No. 58 at 17.) Because Defendants are alleged to have made knowingly false

15   statements, they are not protected by the PSLRA. *See, e.g., Freudenberg v. E*Trade Fin. Corp.,*

16   712 F. Supp. 2d 171, 194 (S.D.N.Y. 2010); s*ee* also *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272,

17   282 (3d Cir. 1992) ("[I]f a defendant characterizes loan loss reserves as "adequate" or "solid"

18   even though it knows they are inadequate or unstable, it exposes itself to possible liability for

19   securities fraud.")

20          Defendants also argue that reserve levels are "projections of future events and results."

21   Defendants only support for this argument is a case from the Western District of Kentucky. In

22   that case, the court noted that projected exposure to outstanding liability claims against a

23   healthcare provider could fluctuate wildly based on the disclosure of a single fact about a case. *In*

24

1  *re Kindred Healthcare, Inc. Secs. Litig.*, 299 F. Supp. 2d 724, 734 (W.D. Ky. 2004). A more

2  analogous case is *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1156

3  (S.D. Cal. 2008), in which the defendant allegedly decreased its reserves as credit quality was

4  decreasing. There, the court held not only that reserves were not merely a projection of future

5  performance, but also that a failure to increase reserves supported an inference of scienter. The

6  Court agrees: reserves are not a projection of future performance in this instance.

7          2.   Puffery

8          Defendants also argue that their statements about the experience of Frontier management,

9  the strength of capital ratios, and their efforts to maintain a strong loan loss reserve are non-

10 actionable puffery. "A statement is considered puffery if the claim is extremely unlikely to

11 induce consumer reliance. Ultimately, the difference between a statement of fact and mere

12 puffery rests in the specificity or generality of the claim." *Newcal Indus. v. Ikon Office Solution*,

13 513 F.3d 1038, 1053 (9th Cir. 2008). The Defendants are correct that statements about the

14 experience level of management such as "I'd like to point out to the callers that we have a very

15 experienced management team." (Dkt. No. 40 at ¶ 48) are non-actionable puffery. But the rest of

16 the statements in Plaintiff's allegations, including those relating to ALLL or capital ratios, are

17 specific enough that an investor might rely on them. It is very difficult to believe that a consumer

18 is "extremely unlikely" to rely on statements like "capital ratios remain strong." These

19 statements are not puffery. *See, e.g., In re New Century*, 588 F. Supp. 2d 1206, 1227 (C.D. Cal.

20 2008).

21      **D.   Loss Causation**

22          Defendants' final argument is that Plaintiff has failed to plead loss causation. When

23 alleging loss causation, a Plaintiff need only "provide a defendant with some indication of the

24

1  loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544

2  U.S. 336, 337 (2005). Plaintiff alleges generally that the decline in stock value from $185 to

3  $11.80 during the class period is a result of Defendants' misstatements. Plaintiff alleges

4  specifically that the issuance of the Cease and Desist Order on March 24, 2009 was responsible

5  for a 13% decline in stock value the following day. (Dkt. No. 40 at ¶¶ 113–115.) These are

6  sufficiently alleged connections between Defendants' actions and a loss in value. The decline in

7  Frontier's stock value is far greater than the market as a whole during that time, so widespread

8  economic conditions alone do not explain the drop. And although the price of Frontier shares

9  quickly recovered after the issuance of the Cease and Desist Order, it is plausible that this

10  recovery had more to do with expectations of government relief than with optimism about

11  Frontier's finances. Plaintiff has sufficiently alleged loss causation to survive a motion to

12  dismiss.

13    **E.      Motion to Strike**

14        Defendants request that the Court strike the allegations in the complaint that reference the

15  statements of confidential witnesses on the grounds that these allegations are "redundant,

16  immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Because the Court has

17  directed Plaintiff to amend his complaint with respect to these allegations, the motion is

18  DENIED.

19    **F.      Request to take Judicial Notice**

20        Pursuant to Federal Rule of Evidence 201(b), Defendants request that the Court take

21  judicial notice of several documents in support of Defendants' motion to dismiss. With respect to

22  the articles, the motion is GRANTED with the proviso that the Court will exercise its discretion

23  in separating fact from opinion. With respect to all other documents, the motion is GRANTED.

24

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss the complaint is GRANTED. (Dkt. No. 55.) Defendant's request to take judicial notice is GRANTED. (Dkt. No. 57.) Plaintiff may amend the complaint as detailed above within twenty-one days of the receipt of this Order.

DATED this 7th day of September 2011.

John C. Coughenour
UNITED STATES DISTRICT JUDGE